UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HERITAGE TECHNOLOGIES, L.L.C., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-1851-LJM-WTL |
| | ) | |
| PHIBRO-TECH, INC., | ) | |
|     Defendant. | ) | |

### ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Heritage Technologies, L.L.C. ("Heritage"), filed this action for breach of contract and declaratory judgment. Phibro-Tech, Inc. ("Phibro-Tech"), counterclaimed for specific performance and two counts of declaratory judgment. This matter comes before the Court on Heritage's Motion for Partial Summary Judgment. The issues have been fully-briefed. Moreover, the Court entertained oral argument on August 8, 2007, on the question of whether the relevant terms of the contract were ambiguous.

For the reasons stated herein, the Court **DENIES** Heritage's Motion for Partial Summary Judgment.

### I. BACKGROUND

Phibro-Tech is a supplier of specialty chemicals, including a compound called ammoniacal etchant ("etchant"). Glover Decl. ¶ 2. Etchant is an ammonia-based substance used to remove copper from circuit boards. *Id.* Since at least mid-2000 and continuing into August 2002, Fred Steward ("Steward") of Heritage and Dwight Glover ("Glover"), the President of Phibro-Tech, engaged in discussions concerning possible business relationships between Heritage and Phibro-

Tech. Def.'s Resp. to Req. for Admiss. (DRRA) No. 1. Specifically, Phibro-Tech and Heritage began to negotiate an acquisition by Heritage of Phibro-Tech's etchant business in the eastern half of the United States and Canada, which was comprised of businesses in Joliet, Illinois, and Sumter, South Carolina. Glover Decl. ¶ 5; Pl.'s Br. in Supp. of Summ. J. at 4.

Steward and Glover met in the Delta Crown Room at LaGuardia Airport and discussed a possible agreement. Glover Decl. ¶ 6; Steward Dep. at 23. Subsequent to this meeting, on September 20, 2002, Heritage's Steward sent a letter to Glover that included an "[o]utline of discussion points for Joliet etchant business."[1] PRA Ex. 2. The letter stated that it did not include a firm offer. *Id.* The most relevant part of this letter referred to "Gain Sharing Payments." The letter stated, in part:

> We [Heritage] will share our business upside by paying additional amounts to Phibro if we produce and sell more than 6,500 tons/yr. of TBCC and/or if copper sulfate pricing to large end users in the feed industry goes above $0.38/pound (currently $0.36/#). On increased production/sales, we would pay Phibro $200/ton. On price increases, we would pay $15/ton TBCC for each $0.01 increase in copper sulfate prices over $0.38/pound.

*Id.* The letter also provided an example of this Gain Sharing Payment: "[i]f copper sulfate increases by $0.03/lb. to ($0.41/lb.) and we are making 8,100 T/Y, we would pay 3 cent increase [sic] x $15/ton x 8,100T = $364,500/yr. x 2 years = $729,000." *Id.*

Phibro-Tech then prepared a draft of the contract in October 2002. DRRA ¶ 5; PRA Ex. 3. This draft included different terms in the Gain Sharing Payment section. The draft stated that "[t]he Gain Sharing Payment shall be equal to the sum of . . . $15 per ton of TBCC sold by HT, Micronutrients of Affiliates thereof for each $0.1 increase in copper sulfate prices to large end users

---

[1] The Sumter, South Carolina business was evidently added later. *See* Pl.'s Br. in Supp. of Summ. J. at 4.

in the field in excess of $0.38 per pound delivered." PRA Ex. 3. Other changes included an increase in the number of years Phibro-Tech would be eligible to receive Gain Sharing payments from two years to three years, and an additional Gain Sharing concept was added based on the price of copper as measured by the Commodities Exchange (COMEX). Glover Decl. ¶ 11; Pl's Br. in Supp. of Summ. J. at 5. In every subsequent draft of the contract, the increase in copper sulfate prices necessary to trigger a Gain Sharing Payment was listed as $0.1. PRA Ex. 3-8, 10, 11, 13, 15, 17, 19, 21. The Gain Sharing Provision in the executed contract stated, in relevant part:

> Gain Sharing. HT [Heritage] shall pay to PTI [Phibro-Tech] in respect of each Measurement Period, a gain sharing payment based on sales (for which payment has been received) by HT, Micronutrients and their Affiliates of more than 6,500 tons per year of TBCC manufactured in the United States of America and/or if copper sulfate pricing to large end users in the feed industry exceeds $0.38 per pound delivered and/or if COMEX copper price exceeds $0.80 per pound (the "Gain Sharing Payments"). The current price of copper sulfate to large end users in the feed industry is $.36 per pound delivered. The Gain Sharing Payment shall be equal to the sum of (i) $200 per ton for Net Sales by HT, Micronutrients and their Affiliates of more than 6,500 tons of TBCC manufactured in the United States of America, (ii) $15 per ton of Net Sales of TBCC manufactured in the Untied States of America and sold by HT, Micronutrients or Affiliates thereof for each $0.1 increase in copper sulfate prices to large end users in the field in excess of $0.38 per pound delivered . . . .

Serv. Agreement, Sec. 3.1(b).

After the contract was executed, copper sulfate prices rose above $0.38 per pound delivered and Glover requested a Gain Sharing Payment from Heritage. Glover Add. ¶ 15. After Heritage denied that a Gain Sharing Payment was due, Glover examined the contract and noticed the $0.1 figure. *Id.* at ¶ 16. Phibro-Tech claims that this was a typographical error and the figure actually agreed to by both parties was $0.01. *Id.*

3

## II. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the

standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to [its] case, one on which [it] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### III.  DISCUSSION

Heritage seeks partial summary judgment that: (1) the language in the Services Agreement providing "for each $0.1 increase in the copper sulfate price" is clear and unambiguous and does not mean $0.01 and (2) Phibro-Tech is not entitled to reformation based on an asserted scrivener's error because there was no contract that as a part of a purchase agreement the figure "$0.1" should have been $0.01 and/or any mistake on Phibro-Tech's part was due to its own negligence, which bars reformation in equity.

The contract at issue states that it will "be construed and enforced in accordance with the internal laws of the State of Indiana."  Serv. Agreement, Sec. 10.5.  Neither party disputes that Indiana law governs this action.  Therefore, the Court will apply Indiana law.

With respect to Heritage's first point that at the "0.1" term is unambiguous, the Court concludes that there is no dispute on this issue.  Although at first blush it would appear that a compelling argument could be constructed that the term is ambiguous because it is an odd way to write ten cents and effectively creates an additional ten-cent "dead band" on top of an expressed two-cent "dead band," Phibro-Tech expressly waived such an argument.  Specifically, Phibro-Tech stated in its brief that "[T]his is not a case where Phibro-Tech is claiming there is ambiguous contract language that ought to be construed in its favor[,]" and "[t]his case has nothing to do with contract construction or any attempt to vary, add or explain the unambiguous terms of a written contract."  Def.'s Opp'n to Hertiage's Mot. for Partial Summ. J. at 1 and at 2, n.2.  Moreover, at oral argument, Phibro-Tech's counsel expressly disavowed that the term is ambiguous and, instead, stated that the central issue in this case amounts to whether the term is a typographical error.  Accordingly, the Court finds that Phibro-Tech has waived any argument that the term is ambiguous.

Having waived an argument that the term is ambiguous, Phibro-Tech relies exclusively on the doctrine of reformation.  In Indiana, a court sitting in equity

> has jurisdiction to reform written documents in only two well-defined situations:  (1) where there is a mutual mistake-that is, where there has been a meeting of the minds, an agreement actually entered into, but the document in its written form does not express what the parties actually intended, or (2) where there has been a mistake by one party, accompanied by fraud or inequitable conduct by the remaining party.

*Plumtree v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 356 (Ind. Ct. App. 1995).  To make an adequate showing to support reformation, a party must "show the original intent or agreement of the parties

6

by clear and convincing evidence." *Estate of Reasor v. Putnam County*, 635 N.E.2d 153, 160 (Ind. 1994). It is important to keep in mind that "reformation is an extreme equitable remedy to relieve the parties of mutual mistake or of fraud." *Peterson v. First State Bank*, 737 N.E.2d 1226, 1229 (Ind. Ct. App. 2000).[2]

Phibro-Tech claims that the "$0.1" term is a scrivener's error. Indiana law states that "a mistake by a scrivener will permit reformation of an instrument if it is logically indicated that both parties were mistaken as to the actual contents of the instrument." *Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1262 (Ind. Ct. App. 1993) (citing *Essex Group, Inc. v. Nill*, 543 N.E.2d 393, 396 (Ind. Ct. App. 1989)). In *Payton v. Hadley*, 819 N.E.2d 432, 440 (Ind. Ct. App. 2004), the court stated that "[u]nder the 'doctrine of scrivener's error,' the mistake of a scrivener in drafting a document may be reformed based upon parol evidence, provided the evidence is clear, precise, convincing and of the most satisfactory character that the mistake has occurred and that the mistake does not reflect the intent of the parties." *Payton v. Hadley*, 819 N.E.2d at 440 (quoting 66 Am. Jur. 2d *Reformation of Contracts* § 19 (2007)). *See also Gerlib v. R.R. Donnelley & Sons Co.*, Cause No. 95 C 7401, 2002 WL 1285795, at *3 (N.D. Ill. June 11, 2002). The Court's understanding of the scrivener's error doctrine in Indiana is that the party that makes such a claim must evidence the same requirements as mistake because it requires such convincing evidence that the alleged mistake does not reflect the true intent of the parties.

---

[2] Phibro-Tech makes no explicit argument that Heritage has engaged in fraudulent or inequitable conduct. Because Phibro-Tech has limited its argument on reformation to the first situation for reformation, the Court will consider only the question of whether there is a triable issue on mutual mistake.

In short, to make an adequate showing in support of reformation, Phibro-Tech must show: (1) the true intention and/or agreement of the parties, (2) the mistake on its part in the preparation of the contract, and (3) either a similar mistake on the part of Heritage or inequitable conduct on Heritage's part. *See First Equity Sec. Life Ins. Co. v. Keith*, 329 N.E.2d 45, 49 (Ind. Ct. App. 1975).

The Court concludes that Phibro-Tech has evidenced a material question of fact on whther a mistake was made with regard to the disputed term. Heritage's letter to Phibro-Tech dated September 20, 2002, states that "[t]his is **not** a firm offer, as I assume we will need to negotiate many details before arriving at a complete definition of a deal. Only then can I request approval of the shareholders of Heritage Technologies." PRA Ex. 2 (emphasis in original). However, that document also expresses the parties' intent that the copper-sulfate gain-sharing provision should be triggered by $0.01 increases after the price reached $0.38. *Id.* This provision was one of three major provisions referenced in the September 20, 2002, letter. *Id.*

Glover's declaration supports a conclusion that the parties' had an agreement in principle on this term. In the relevant paragraph, Glover states:

> The basic structure of the transaction was hammered out during the course of an in-person negotiating session at the Delta Crown Room at LaGuardia Airport in Queens, New York. During that meeting, Mr. Steward and I reached agreement on a number of business terms. I understood that all of our agreements on deal points were subject to further negotiation and documentation in a written contract. And, in act, a number of the points we agreed to during our meeting at the Delta Crown Room were thereafter negotiated and changed during the course of further negotiations. Other points, however, were never again discussed or negotiated.

Glover Decl. at ¶ 6.

Similarly, in his deposition, Steward admits that Glover and he "had talked about [thirty-six] cents as a current price. And that we should give a dead band so that it wouldn't be care-trigger [sic]

8

sensitive before the gain sharing started, the [thirty-eight] cents was low." Steward Dep. at 23.

Steward further admits that he and Glover had discussed a $0.01 increment. *Id.* at 39. However, Steward went on to testify:

> Q. Prior to the execution of the services agreement, did you ever conclude that the $0.1 figure in connection with the copper sulfate gain-sharing provision was a proposal by Phibro-Tech?
>
> A. Yes.
>
> Q. When did you come to that conclusion?
>
> A. It was an assumption throughout the drafting and reviewing drafts. And it was a bundling of a variety of changes. So it was the latest proposal in a series. And that was the only logical way that we could interpret it.
>
> Q. You concluded that it would have been illogical for that figure $0.1 to be a mistake or typographical error?
>
> A. That's correct.
>
> Q. And did you give it active consideration? In other words, did you actually reach that conclusion?
>
> A. It was the basis of our decision when we were reviewing the need for caps of gain sharing. The basis for our decision that we did not need to cap it was that there was no logical explanation for it having been intended to be .01
>
> * * *
>
> Q. Did you ever consider that it was unusual for Phibro-Tech to propose an economic term that was so decidedly against its economic interest?
>
> A. Not when you put it into context.
>
> Q. What's the context?
>
> A. That there were three changes from the September 20 proposal that we had made. One of those was to add the COMEX, which in essence is I call it [sic.] double dipping. It's a second way to gain share on the same copper increase as the copper sulfate. So it was in essence doubling up their gain on copper changes. And, also,

> it was changed from a two-year proposal in September 20 to a three-year proposal in the draft, the first draft. So when you put the whole bundle together, it seemed to us it was the only logical way to interpret that it was a quid pro quo, a give and take.

Steward Dep. at 54-55, 56.

Beyond these competing statements by the parties, the evidence is that the only time the parties discussed this particular gain-sharing provision was when Glover and Steward met at LaGuardia airport. On this evidence, in order to determine whether or not reformation is appropriate the Court must judge the credibility of Glover's and Steward's statements about whether or not there was a mistake. Credibility determinations are not appropriate at the summary judgment stage. *See Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) ("'On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts . . . .'" (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). For this reason, the Court concludes that Heritage's Motion for Partial Summary Judgment must be **DENIED**.

## IV.  CONCLUSION

For the reasons stated herein, Plaintiff's, Heritage Technologies, L.L.C., Motion for Partial Summary Judgment is **DENIED**.  The Final Pretrial Conference in this matter is hereby **RE-SET for Friday, November 9, 2007, at 3:00 p.m., in Room 204**, and the Court Trial in this matter is hereby **RE-SET for Monday, November 19, 2007, at 9:00 a.m., in Courtroom 202**, Birch Bayh Federal Building and United States Courthouse, 46 East Ohio Street, Indianapolis, Indiana.

It is so ordered this 20th day of August 2007.

                                                                 _____
                                                                 LARRY J. McKINNEY, CHIEF JUDGE
                                                                 United States District Court
                                                                 Southern District of Indiana

Electronically distributed to:[3]

Thomas A. Cunningham
CUNNINGHAM WELSH DARLOW ZOOK
    & CHAPOTON, LLP
tcunningham@cdzc.com

G. Daniel Kelley Jr.
ICE MILLER LLP
daniel.kelley@icemiller.com

Andrew W. Gefell
PROSKAUER ROSE LLP
agefell@proskauer.com

Michael T. Mervis
PROSKAUER ROSE LLP
mmervis@proskauer.com

Michael  Rabinowitch
WOODEN & MCLAUGHLIN LLP
mrabinowitch@woodmaclaw.com

---

[3] The Court will not mail copies of this Order to those attorneys of record who have not provided their email address to the Court.  As of September 1, 2004, the failure to register for the Court's electronic filing system constitutes a violation of Local Rule 5.7(b).  It is the responsibility of co-counsel who are registered to ensure that the entry is distributed to all non-registered counsel, and registered counsel should urge all counsel to comply with the local rule and register to use the Court's electronic filing system so that they may receive notice of future entries from the Court via email.  Information on how to register may be found on the Court's website at http://www.insd.uscourts.gov/ecf_info.htm.