UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| HERITAGE TECHNOLOGIES, L.L.C., | ) | |
|        Plaintiff, | ) | |
| | ) | |
|    vs. | ) | 1:05-cv-1851-LJM-WTL |
| | ) | |
| PHIBRO-TECH, INC., | ) | |
|        Defendant. | ) | |

## ORDER FOLLOWING BENCH TRIAL

On November 19-20, 2007, the Court held a bench trial on the claims of the Plaintiff,

Heritage Technologies, L.L.C. ("Heritage"), and the counterclaims of Phibro-Tech, Inc. ("Phibro-

Tech").  Heritage initiated this lawsuit and seeks a declaration that the term "$0.1" in a written

contract between the parties means a dime, or $0.10.  In addition, Heritage claims that Phibro-Tech

breached the contract by violating certain non-compete provisions.  Heritage seeks damages and

injunctive relief for its breach of contract claim.  Phibro-Tech, contending that the term "$0.1" was

meant to be a penny (or $0.01),  has counterclaimed seeking reformation of that term and specific

performance.  In addition, Phibro-Tech seeks a declaration that the non-compete provisions are void

as against public policy.  The Court, having heard all the evidence, reviewed the exhibits, and

considered the facts in light of the relevant law, now renders its final decision regarding the matters

presented at trial.[1]

---

[1] This opinion shall constitute the findings of fact and conclusions of law required by
Federal Rule of Civil Procedure 52(a).  Any finding of fact that is more properly considered a
conclusion of law is adopted as such.  Similarly, any conclusion of law that is more properly
considered a finding of fact is adopted as such.  Finally, the Court recognizes that there was
conflicting testimony on several issues presented at trial.  The Court considered all of the
evidence presented by the parties in arriving at its findings of fact.

## I. FINDINGS OF FACT

### A. GENERAL BACKGROUND FACTS

1. Both Heritage and Phibro-Tech are suppliers of ammoniacal etchant ("etchant"), which is a substance used to remove copper from circuit boards. *See* Trial Tr. at 10-15, 201. Before it is used, the etchant is commonly referred to as "fresh etchant." *See* Trial Tr. at 12-15. Fresh etchant is priced by the gallon. *See* Trial Tr. at 12.

2. A by-product of etchant is "spent etchant," which customers typically return to the supplier without charge. *See* Trial Tr. at 12-15. Another by-product of the circuit board manufacturing process is cupric, which is typically sold to a supplier at the same time that spent etchant is returned. *See id.* Both by-products are used by Heritage and Phibro-Tech in the manufacturing of other products, including animal feed and agricultural products. *See* Trial Tr. at 9, 11, 17, 46, 179.

3. One of the divisions of Heritage is Micronutrients. *See* Trial Tr. at 5. Micronutrients's primary business is supplying feed producers with tribasic copper chloride ("TBCC"), a copper additive. *See* Trial Tr. at 11-12. TBCC directly competes in the additive market with copper sulfate ("$CuSO_4$"). *See* Trial Tr. at 17-19 The prices of TBCC and $CuSO_4$ tend to move in tandem because of their use of copper as an ingredient and their competition in the market place. *See* Trial Tr. at 19-21.

## B. FACTS REGARDING NEGOTIATIONS AND CONTRACT

4.   In mid-2002, the companies began to negotiate an acquisition by Heritage of Phibro-Tech's customer list for a portion of its etchant business.  *See* Trial Tr. at 22-23, 202.  Those customer were located within the eastern half of the United States and Canada.  *See* Trial Tr. at 125-26, 191; Pl.'s Ex. 1B, Schedule 1.1(bb) and 2.2.  By acquiring Phibro-Tech's customers in the eastern half of the United States and Canada, Heritage would be faced with only one other competitor in the territory:  a company named Old Bridge Chemical Company ("Old Bridge").  *See* Trial Tr. at 54, 191.  The two principal entities involved in the negotiation process were Dwight Glover ("Glover"), Phibro-Tech's President, and Fred Steward ("Steward"), President of Heritage's Micronutrients Division.  *See* Trial Tr. at 5, 22-23, 54, 150-51, 200.

5.   One significant point of negotiations was the purchase price.  Given the instability of the circuit board industry at the time, there was uncertainty about the value of Phibro-Tech's customer list.  *See* Trial Tr. at 23-24, 212, 224, 259.  Phibro-Tech wanted a larger up-front payment than Heritage was willing to make.  *See* Trial Tr. at 23-25.  Ultimately, Phibro-Tech agreed to take a smaller up-front payment in exchange for Heritage's agreement to make certain "gain sharing" payments in the event that future economic conditions changed to make the business profitable for Heritage.  *See* Pl.'s Ex. 1B, § 3.1(b), p. 8.

6.   One of the gain sharing provisions that was discussed involved the price of $CuSO_4$.  *See* Trial Tr. at 20.  A rise in the price of $CuSO_4$ would make sales of TBCC more profitable for Heritage because, as noted, the prices of the two items generally increased in relation to each other.  *See* Trial Tr. at 19-21.

3

7.  As part of the negotiations, Steward sent Glover a letter dated September 20, 2002, that outlined the basic structure of the transaction envisioned by Heritage.  *See* Pl.'s Ex. 2.  Steward set forth the $CuSO_4$ gain sharing provision and example as follows:

> We will share our business upside by paying additional amounts to Phibro if we produce and sell more than 6,500 tons/yr. of TBCC and/or if copper sulfate pricing to large end users in the feed industry goes above $0.38/pound (currently $0.36/#[sic]).  On increased production/sales, we would pay Phibro $200/ton.  On price increases, we would pay $15/ton TBCC for each $0.01 increase in the copper sulfate price over $0.38/pound.
>
> *  *  *
>
> If copper sulfate increases by $0.03/lb. (to $0.41/lb) and we are making 8,100 T/Y, we would pay 3 cent increase x $15/ton x 8,100T = $364,500/yr . . . .

*Id.*

8.  Steward's proposal on the $CuSO_4$ gain sharing provision was consistent with a description that he had previously sent to two of Heritage's owners, Fred Fehsenfeld and Ken Price, in an internal memorandum dated September 19, 2002.  *See* Def.'s Ex. 2.

9.  Steward and Glover subsequently met on October 4, 2002, at the Delta Crown Room in LaGuardia Airport for in-person negotiations.  *See* Trial Tr. at 25, 82, 207-08.  At the conclusion of their meeting, the two memorialized a number of points in a handwritten "General Agreement between [Phibro-Tech] and [Heritage]" drafted by Glover.  *See* Trial Tr. at 25-26; Pl.'s Ex. 28.  That document provided that gain sharing would be "as defined in section 3 of 9/20/02 proposal," referring to Steward's letter to Glover that proposed a $0.01 figure with respect to the $CuSO_4$ provision.  *See* Pl.'s Ex. 28; Def.'s Ex. 2.

10.  Negotiations continued after the meeting at the Delta Crown Room and resulted in some changes to the terms discussed at the Delta Crown Room and the addition of new terms.  Steward

and Glover communicated with each other during these negotiations by telephone and by exchanging proposed drafts of the final agreement. *See* Trial Tr. at 29-32, 44, 165, 252-53.

11. The first draft of the agreement was prepared by Phibro-Tech, which made several changes to the matters discussed by Steward and Glover. *See* Pl.'s Ex. 3. With respect to the $CuSO_4$ gain sharing provision, that draft indicated that a "$0.1" change would be the "triggering" number for payments. *See id.*, § 3.1(c), p. 8. The first draft also made two other changes to the gain sharing provisions. Specifically, it added a third year to the gain sharing period and added a new category for payments based on increases in the COMEX copper prices multiplied by the gallons of cupric received from customers. *See id.*

12. Even though the first draft omitted a hundredths digit for the triggering number in the $CuSO_4$ gain sharing provision, Glover admitted at the trial that he would write monetary values in a short-hand format that omitted the hundredths digit when it was a zero. *See* Trial Tr. at 151-55. In fact, he did just that in the October 4, 2002, General Agreement that he drafted. *See* Pl.'s Ex. 28.

13. In all, the parties exchanged some eight drafts of what would become the Services Agreement and made several changes during that time, including changes to the gain sharing provision. *See* Pl.'s Exs. 3, 4, 6, 8, 11, 15, 19, 1B. At no time after the meeting at the Delta Crown Room was the "$0.1" figure changed or discussed. *See id.*; Trial Tr. at 163, 169, 209, 236.

14. At some point prior to executing the final draft of the agreement, Steward's counsel asked him about the "$0.1" figure and whether it was a typographical error. *See* Trial Tr. at 40, 116. Steward testified that he did not believe it was a typographical error. *See* Trial Tr. at 40-43. Instead, he believed that the figure was meant to be a proposal to change the figure to a dime because the initial draft had included an additional gain sharing provision that previously had not been discussed.

5

*See id.* Steward reasoned that the revised figure was a "quid pro quo" for adding the new gain

sharing provision. *See id.* He opted not to contact Glover to clarify whether the figure was just a

typographical error. *See id.*

15. The \$.0.1" was not changed and the ultimately was included in the final version of the

Services Agreement executed on November 25, 2002. The executed gain sharing provision reads:

> <u>Gain Sharing</u>. [Heritage] shall pay to [Phibro-Tech] in respect of each Measurement
> Period, a gain sharing payment based on sales (for which payment has been received)
> by [Heritage], Micronutrients and their Affiliates of more than 6,500 tons per year
> of TBCC manufactured in the United States of America and/or if copper sulfate
> pricing to large end users in the feed industry exceeds \$0.38 per pound delivered
> and/or if COMEX copper price exceeds \$0.80 per pound (the "<u>Gain Sharing
> Payments</u>"). The current price of copper sulfate to large end users in the feed
> industry is \$.36 per pound delivered. The Gain Sharing Payment shall be equal to the
> sum of (i) \$200 per ton for Net Sales by HT, Micronutrients and their Affiliates of
> more than 6,500 tons of TBCC manufactured in the United States of America, (ii)
> \$15 per ton of Net Sales of TBCC manufactured in the Untied States of America and
> sold by [Heritage], Micronutrients or Affiliates thereof for each **\$0.1** increase in
> copper sulfate prices to large end users in the field in excess of \$0.38 per pound
> delivered . . . .

Pl.'s Ex. 1B (Services Agreement), § 3.1(b), p. 8 (emphasis added).

16. In addition to the gain sharing provision, the final Services Agreement executed by the

parties contained a non-compete provision. That provision reads, in relevant part:

ARTICLE VIII.

NON-SOLICITATION; CONFIDENTIALITY

> <u>Section 8.1.   By [Phibro-Tech] and its Affiliates</u>.   After the Closing, except as
> specifically required pursuant to <u>Schedule 2.1(a)</u> hereto, [Phibro-Tech] shall not, and
> shall cause its Affiliates not to (a) directly or indirectly manufacture or sell Products
> or Substitute Products to, or accept Cupric supplies from, (i) Customers or (ii)
> entities known by [Phibro-Tech] to be acting on behalf of plants or facilities located
> in the Territory, (b) directly or indirectly manufacture or sell Products at or form the
> Facilities, or (c) directly or indirectly initiate communications with, solicit, entice, or
> induce any (i) Customers or (ii) entities known by [Phibro-Tech] to be acting on

> behalf of plants or facilities located in the Territory, to terminate, reduce or phase out, any contractual relationship or other relationship with [Heritage] with respect to Products or Substitute Products, in each case for the period commencing on the Closing Date and continuing through the date that is seven (7) years from the third anniversary of the Closing Date . . . .

*Id.*, § 8.1, p. 16.

17.   The parties also contemplated two additional points of note.  First, they agreed that they would participate in arbitration if any portion of the Services Agreement was deemed invalid, illegal or unenforceable.  Second, they agreed that the party prevailing in an action to enforce the rights of the agreement would be entitled to recover reasonable attorneys' fees and costs from the other party.  Specifically, those provisions read as follows:

> Section 10.9.  Severability.  Each of the provisions of this Agreement are intended not to violate any law, rule, regulation or public policy.  In case any one or more of the provisions or parts of a provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, then the parties shall submit to an arbitrator, acting in accordance with the rules and procedures of the American Arbitration Association, the invalid, illegal or unenforceable portions for the purpose of revising such provisions so as to make them valid, legal and enforceable under the circumstances and the parties agree that any such revisions shall be binding.  Any such invalidity, illegality or unenforceability shall not affect any other provision or part of a provision of this Agreement.

> * * *

> Section 10.14.  Attorneys' Fees.  In the event any action is brought to enforce the rights of any party to this Agreement, the prevailing party in such action is entitled to the recovery of its reasonable attorneys' fees and costs thereof from the other party, in addition to any other relief it may receive as a court of jurisdiction may determine.

*Id.*, §§ 10.9 and 10.14, p. 22.

18.   Contemporaneous with the signing of the Services Agreement, the parties also signed a License Agreement.  *See* Pl.'s Ex. 1A (License Agreement).  Like the Services Agreement, the

License Agreement went through several drafts before it was executed. *See* Pl.'s Exs. 9, 12, 16, 20.

19. The License Agreement provided Heritage with a ten-year license to use Phibro-Tech's etchant formula so that Phibro-Tech's customers could be assured that the etchant sold by Heritage would perform the same in the circuit board manufacturing process. *See* Pl's Ex. 1A, § 6.1, p. 8; Pl's Ex. 45. The license was important to Heritage because it hoped to make the customers feel comfortable using Heritage's products and understand that they would not have to make changes in their circuit board manufacturing process to account for a different etchant formula. Trial Tr. at 51, 180. In fact, the parties prepared form letters for the customers to assure the customers that they would receive the same formula from Heritage that they had been receiving from Phibro-Tech. *See* Pl.'s Ex. 45.

20. The License Agreement contained a non-compete agreement similar to the one in the Services Agreement. *See id.*, § 8.1, pp. 9-10.

### C. FACTS GIVING RISE TO THE DISPUTE AND LITIGATION

21. Sometime after the execution of the Services Agreement, Heritage discovered a mistake in one of the gain sharing provisions. Specifically, § 3.1(b)(iii) of the Services Agreement addresses a payment based on an increase in the price of copper according to the COMEX and indicated that a payment would be calculated on "Fresh Ammoniacal Etchant sold." *See* Pl.'s Ex. 1B, § 3.1(b), p. 8. This wording appeared in the first draft of the Services Agreement but apparently was not consistent with the parties' agreement. *See* Pl.'s Ex. 3, § 3.1(c), p. 8; Trial Tr. at 60, 236-37. The parties had actually agreed that the calculation should be based on "spent etchant received" from customers. *See* Trial Tr. at 60, 236-37. When Steward brought the error to Glover's attention,

8

Glover agreed that the calculation should be based on spent etchant received, even though it was to Phibro-Tech's disadvantage to do so. *See* Trial Tr. at 236-37.

22.    Thereafter, another dispute arose between the two parties.    Under the Services Agreement, Heritage was responsible for calculating the amount of any gain sharing payments owed to Phibro-Tech and providing Phibro-Tech with a bi-annual report explaining the calculations. *See* Pl.'s Ex 1B, §§ 4.1 and 4.2, p. 9.  During the first few years, the price of $CuSO_4$ had not risen above $0.38 per pound and so Heritage reported that no gain sharing payment was due with respect to the $CuSO_4$ provision. *See* Pl.'s Exs. 23 and 26; Def.'s Exs. 7.  However, by the Summer of 2004, the price had risen above $0.38 per pound. *See* Pl.'s Exs. 24 and 26; Def.'s Exs. 8-9.  Nonetheless, at the end of 2004, Heritage reported that no gain sharing payment was due because the average price of $CuSO_4$ had been $0.478 per pound. *See id.*

23.  Glover believed that a gain sharing payment under the $CuSO_4$ provision was due for 2004. *See* Trial Tr. at 173.  He understood that a payment was due for a $0.01 per pound increase in the price of $CuSO_4$ above the $0.38 trigger. *See id.*  After learning that Heritage's position was that the Services Agreement only called for a payment if there was a $0.10 per pound increase in the price of $CuSO_4$, Glover looked at the Services Agreement and noticed the "$0.1" term. *See* Trial Tr. at 174.  Glover then contacted Steward about the fact that he felt the "$0.1" term was a typographical error and that it was inconsistent with the parties' original understanding as discussed at the Delta Crown Room. *See* Trial Tr. at 235-36; Def.'s Ex. 5.  Steward did not agree to make the gain sharing payment based on a $0.01 per pound increase. *See* Trial Tr. at 236.

24.  Subsequently, in November 2005, one of Phibro-Tech's employees sent an email to a broker for PC Board, Inc. ("PCB") offering to supply PCB with an etchant product called "PTI's

High Speed Ac-Cu-Guard Plus" at price of $0.58 per gallon for six months. *See* Trial Tr. at 181-82; Pl.'s Ex. 29. PCB is one of the customers listed in a Schedule of Customers that Phibro-Tech agreed not to solicit, and "PTI's High Speed Ac-Cu- Guard Plus" is a product covered by the non-compete provisions of the contracts. *See* Pl.'s Ex. 1A, Schedule 1; Pl.'s Ex. 1B, Schedule 2.2.

25. PCB's general manager forwarded the email price-quote to Micronutrients's marketing and sales manager, Jeff Cohen ("Cohen"). *See* Trial Tr. at 181-82; Pl.'s Ex. 29. Cohen immediately sent a letter to PCB agreeing to lower Heritage's price to only $0.58 per gallon. *See* Trial Tr. at 182; Pl.'s Ex. 40, 54, 128. In order to match the Phibro-Tech quote, Micronutrients had to lower its price from $0.95 per gallon plus shipping and a fuel surcharge to the flat fee. *See* Pl.'s Ex. 30. However, unlike the quote from Phibro-Tech, Micronutrients did not place a time limit on the quoted price. *See* Pl.'s Ex. 40. As a result, Heritage calculates that it lost $22,084.78 in the first six months that it sold to PCB at $0.58 per gallon, and it calculates that it has lost a total of $48,907.70 up until the trial in this matter. *See* Pl.'s Ex. 31.

26. Aside from Cohen's letter, no one from Heritage otherwise contacted PCB or Phibro-Tech to see if the email quote was withdrawn. *See* Trial Tr. at 127-28, 187-88. Moreover, Heritage did not try to raise the price above $0.58 per gallon until approximately ninety days before trial, at which time PCB refused to agree to a price increase. *See* Trial Tr. at 128, 189-90.

27. Shortly after Phibro-Tech's employee quoted the price to PCB, Steward contacted Glover about the incident. *See* Trial Tr. at 126. After checking up on the matter, Glover realized that PCB was one of the customers that Phibro-Tech was prohibited from soliciting, and he had the quote withdrawn. *See* Trial Tr. at 126, 238, 241. Glover also apologized to Steward for what he believed was an inadvertent violation. *See* Trial Tr. at 126-27, 237-38, 241; Def.'s Ex. 14. Specifically,

10

Glover's belief was premised on the fact that the state where PCB was located was not a "protected" state and the customer list that was mistakenly referenced when the quote was made was for the first month of the agreement, which did not include PCB at the time. *See* Trial Tr. at 237-38.

28. Phibro-Tech did not make a single sale to PCB and Heritage did not lose any sales to PCB as a result of the email price quote. *See* Trial Tr. at 187-88, 238. Further, aside from this one incident with PCB, there is no evidence that Phibro-Tech provided any other quotes for any customer who is listed on the Schedule of Customers. *See* Trial Tr. at 137, 188-89.

29. In its response to a Request for Admission, Phibro-Tech has admitted that its actions violated the agreement if the non-compete provisions are enforceable. *See* Pl.'s Ex. 38.

30. Notwithstanding Glover's apology for the PCB incident, withdrawal of the email quote, and the fact that Phibro-Tech has not provided any other quotes to customers listed on the Schedule of Customers, Steward sent Glover a letter indicating that Heritage was "insecure with regard to Phibro's performance." *See* Def.'s Ex. 13. The letter, sent after Heritage had initiated this lawsuit, was dated February 6, 2006. *See id.* In the letter, Steward cited the dispute over the term "$0.1" and "continuing breach(es) of the nonsolicitation provision" as the reasons for Heritage's insecurity. *See id.* He further indicated that Heritage was prepared to tender the amount it calculated that Phibro-Tech was owed under the royalty and gain sharing provisions, but he demanded that Phibro-Tech discharge Heritage from any additional amount that Phibro-Tech claimed it was owed and provide assurance that Phibro-Tech would "cease breaching" the non-compete provision. *See id.*

31. Glover responded to Steward's letter via letter dated February 14, 2006. *See* Def.'s Ex. 14. Glover noted that the issues in Steward's letter were the subject of this lawsuit and would be resolved by the Court. Further, he indicated that Phibro-Tech was owed, at a minimum, the amount

that Heritage was withholding and that Phibro-Tech would consider Heritage in material breach of the agreement if it did not tender the amount indisputably owed.  *See id.*  Finally, while stating that Phibro-Tech believed that the non-compete provisions were void as against public policy, Glover assured Steward that Phibro-Tech would not act in contravention of those provisions until its enforceability had been determined.  *See id.*

32.  After receiving Glover's response, Steward informed Glover that Heritage would agree to pay the undisputed amount that Heritage owed provided that Phibro-Tech signed an agreement not to violate or act in contravention of the non-compete provisions until their enforceability was determined.  *See* Def.'s Ex. 15.  Both parties subsequently executed a "Supplemental Agreement to the Services Agreement and License Agreement" to that effect.  *See* Pl.'s Ex. 1C.

## II.  CONCLUSIONS OF LAW

### A.  REFORMATION ISSUE

1.  There is no dispute between the parties that the resolution of their dispute over the term "$0.1" is dependent upon the application of Indiana's law governing the reformation of contracts.[2]

2.  In Indiana, a court sitting in equity has jurisdiction to reform written documents in only two well-defined situations: "(1)where there is a mutual mistake -- that is, where there has been a meeting of the minds, an agreement actually entered into, but the document in its written form does not express what the parties actually intended, or (2) where there has been a mistake by one party,

---

[2]  Both the License Agreement and Services Agreement explicitly provide that Indiana law shall govern the interpretation of the contracts.  *See* Pl.'s Ex. 1A, § 10.2, p. 13; Pl.'s Ex. 1B, § 10.5, p. 20.

accompanied by fraud or inequitable conduct by the remaining party." *Plumtree v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 356 (Ind. Ct. App. 1995).

3.   To make an adequate showing to support reformation, a party must "show the original intent or agreement of the parties by clear and convincing evidence." *Estate of Reasor v. Putnam County*, 635 N.E.2d 153, 160 (Ind. 1994).

4.   It is important to keep in mind that "reformation is an extreme equitable remedy to relieve the parties of mutual mistake or of fraud." *Peterson v. First State Bank*, 737 N.E.2d 1226, 1229 (Ind. Ct. App. 2000).

5.   Phibro-Tech claims that the term "$0.1" is a scrivener's error.  Indiana law states that "a mistake by a scrivener will permit reformation of an instrument if it is logically indicated that both parties were mistaken as to the actual contents of the instrument." *Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1262 (Ind. Ct. App. 1993) (citing *Essex Group, Inc. v. Nill*, 543 N.E.2d 393, 396 (Ind. Ct. App. 1989)).

6.   In *Payton v. Hadley*, 819 N.E.2d 432, 440 (Ind. Ct. App. 2004), the court stated that "[u]nder the 'doctrine of scrivener's error,' the mistake of a scrivener in drafting a document may be reformed based upon parol evidence, provided the evidence is clear, precise, convincing and of the most satisfactory character that the mistake has occurred and that the mistake does not reflect the intent of the parties." *Payton v. Hadley*, 819 N.E.2d at 440 (quoting 66 Am. Jur. 2d *Reformation of Contracts* § 19 (2007)).  *See also Gerlib v. R.R. Donnelley & Sons Co.*, Cause No. 95 C 7401, 2002 WL 1285795, at *3 (N.D. Ill. June 11, 2002).  In other words, the scrivener's error doctrine in Indiana requires the party making such an argument to show by convincing evidence that the alleged mistake does not reflect the true intent of the parties.

7. Based on the foregoing, to make an adequate showing in support of reformation, Phibro-Tech must show: (1) the true intention and/or agreement of the parties, (2) the mistake on its part in the preparation of the contract, and (3) either a similar mistake on the part of Heritage or inequitable conduct on Heritage's part. *See First Equity Sec. Life Ins. Co. v. Keith*, 329 N.E.2d 45, 49 (Ind. Ct. App. 1975).

8. The Court concludes that Phibro-Tech has failed to demonstrate by clear and convincing evidence that there was a mutual mistake by both parties. More specifically, Phibro-Tech has not demonstrated that there was a "meeting of the minds" that the term "$0.1" was supposed to be a penny.

9. Although Glover's testimony demonstrates that he thought that the parties had agreed to a penny and that the term was a typographical error, Steward testified that he considered the figure to be a proposal based on the inclusion of additional terms and changes that were made in the first draft of the agreement prepared by Phibro-Tech. Both Glover and Steward were credible witnesses, and the Court has no reason to dispute either individual's testimony.

10. Further, both men agreed that one way in which they communicated during the negotiation process was by sending drafts to each other. The Court finds it significant that both parties were represented by a team of lawyers, the agreement went through some eight drafts, and the term was never changed, despite several other changes and additions to the gain sharing provisions.

11. Based on the foregoing, the Court concludes that there is no evidence that both parties mutually agreed that the triggering term would be a penny. Therefore, Phibro-Tech cannot prevail on a theory of mutual mistake.

12.   Similarly, Phibro-Tech cannot prevail based on its contention that the term is a scrivener's error.  In order for this doctrine to apply, Indiana law requires a showing that both parties were mistaken as to the actual contents of the instrument.  *See Beradi*, 625 N.E.2d at 1262.  As the Court has already concluded, Phibro-Tech has failed to demonstrate that this was the case.  In fact, Steward's testimony reveals that he was aware that the term was different from that originally proposed.

13.   The only question then is whether Phibro-Tech has demonstrated by clear and convincing evidence that Heritage has engaged in "fraud or inequitable conduct." *Plumtree*, 655 N.E.2d at 356.

14.   The only evidence that Phibro-Tech presented to demonstrate fraud or inequitable conduct is (1) the fact that Phibro-Tech had previously agreed to change an error in the gain sharing provisions even though the change was contrary to Phibro-Tech's economic interest; and (2) the fact that Steward considered the possibility that the term was a typographical error but never directly contacted Glover to question him about the term.

15.   The Court concludes that these facts, either separately or together, are insufficient to demonstrate that Heritage engaged in fraud or inequitable conduct.

16.   First, the agreement of the parties to fix another error in the gain sharing provisions does not support a finding that Heritage acted inappropriately with respect to the term "$0.1."  This error occurred in the third gain sharing provision, which based a payment on an increase in the price of copper according to COMEX and "Fresh Ammoniacal Etchant sold" to customers.  *See* Pl.'s Ex. 1B, § 3.1(b), p. 8.

17.   Unlike the term "$0.1" in the second gain sharing provision, there is clear and convincing evidence that the parties had not agreed to base a payment on fresh etchant sold.  *See*

15

Trial Tr. at 60, 236-37.  Instead, they had agreed to condition this particular payment, in part, on spent etchant received from customers.  *See id.*  Thus, this situation represented a mutual mistake by the parties that would have been subject to reformation.

18.  Moreover, it is clear from reading the third gain sharing provision that conditioning payment on fresh etchant sold does not make sense in light of the other terms in the provision. Specifically, that provision provides that a payment is based on a 50% increase in the price of copper multiplied by gallons received from a customer.  *See* Pl.'s Ex. 1B, § 3.1(b), p. 8.  The only things that the parties received from customers were spent etchant and cupric.  In fact, the third gain sharing provision later specifically references cupric received from customers.  Thus, the term "Fresh Ammoniacal Etchant sold" does not make sense within the context of the provision.

19.  Based on the foregoing circumstances, the Court cannot conclude that an agreement to correct what was an obvious error in the third gain sharing provision is evidence of fraudulent or inequitable conduct on the part of Heritage with respect to the term "$0.1" in another provision.

20.  Similarly, the Court is reluctant to find that Heritage is guilty of fraud of inequitable conduct based on the fact that Steward considered the possibility that the term "$0.1" was a typographical error and opted not to confront Glover about the term.  Instead, the Court finds this case involved an arms-length transaction between two sophisticated companies of equal bargaining power who were each represented by a team of lawyers.

21.  Moreover, there is no evidence that Heritage attempted to conceal the term.  The term was not buried in some sort of fine print but was plain and conspicuous the entire time.  In fact, it was present in some eight different drafts of the agreement, which resulted in several changes to the gain sharing provisions.  *See* Pl.'s Exs. 3, 4, 6, 8, 11, 15, 19, 1B.  Indeed, Phibro-Tech was alerted

to the necessity of reviewing the entire section during the negotiation process because the initial redraft done by Heritage bolded the entire section to illustrate that Heritage had made changes to the gain sharing provisions. *See* Pl.'s Ex. 3, § 3.01(c), p. 7.

22.  In addition, there is no evidence that Heritage attempted to obfuscate the meaning of the term. In fact, there is no question that Glover would understand that the term meant a dime given his shorthand practice of dropping the hundredths digit when it was a zero. *See* Trial Tr. at 151-55.; Pl.'s Ex. 28.

23.  Based on the foregoing, the Court finds that Phibro-Tech has failed to demonstrate fraud or inequitable conduct. Therefore, Phibro-Tech's reformation argument must fail. Thus, the gain sharing provision remains with the term "$0.1" as written by the parties.

24.  As the parties made clear at the oral argument held on August 8, 2007, and as the Court decided in its August 20, 2007, Order on Plaintiff's Motion for Partial Summary Judgment, there is no dispute that the term "$0.1" is unambiguous. The Court concludes that the plain meaning of the term "$0.1" expresses a tenth of a dollar, or ten cents. Even though the Court believes that this is an atypical way to express ten cents, it is something that should have been understood by Glover to mean ten cents because it was not unusual for him to omit the hundredths place when writing monetary amounts in shorthand. *See* Trial Tr. at 151-55; Pl.'s Ex. 28.

25.  For all of the foregoing reasons, the Court concludes that Heritage is entitled to a declaration that the term "$0.1" be interpreted literally to mean $0.10, *i.e.*, ten cents. Therefore, the Court **GRANTS** Heritage's request for a declaration to that effect.

## B.  ISSUES RELATED TO THE NON-COMPETE PROVISIONS

### 1.  Phibro-Tech's Contention That The Provisions Are Not Enforceable

26.  In addition to the dispute over the term "$0.1," the parties dispute whether the non-compete provisions contained in the License Agreement and Services Agreement are enforceable.

27.  In Indiana, covenants not to compete are generally not favored by the law.  *See, e.g.*, *Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind. 2005).  However, Indiana courts will enforce such agreements if they are reasonable.  *See id.*  Moreover, Indiana courts are more liberal in enforcing a sale of business covenant than they are in enforcing an employment covenant.  *See id.* at 668.

28.  The reasonableness of a non-compete agreement is measured in terms of time, space, and prohibited activity.  *See Young v. Van Zandt*, 449 N.E.2d 300, 304 (Ind. Ct. App. 1983).  Further, sale of business covenants are "deemed reasonable when they are 'limited to the area of business involved . . . .'"  *Dicen*, 839 N.E.2d at 688 (quoting *Donahue v. Permacel Tape Corp.*, 234 Ind. 398, 405-06, 127 N.E.2d 235, 238 (1955)).

29.  Indiana courts typically apply a three-pronged test to evaluate whether a covenant not to compete ancillary to the sale of a business is overbroad and unreasonable.  Specifically, Indiana courts consider (1) whether the covenant is broader than necessary for the protection of the covenantee in some legitimate interest; (2) the effect of the covenant upon the covenantor; and (3) the effect of the covenant upon the pubic interest.  *See Ridgefield Park Transp. v. Uhl*, 803 F. Supp. 1467, 1569 (S.D. Ind. 1992) (citing *Fogle v. Shah*, 539 N.E.2d 500, 503 (Ind. Ct. App. 1989)).  If a covenant fails on any one of these prongs, it is unreasonable.  *See id.*  Further, the first prong, along

18

with a consideration of the reasonableness as to time, space, and activity restricted, are of prime importance in the analysis. *See Fogle*, 539 N.E.2d at 503.

30. Phibro-Tech argues that the non-compete provisions should not be enforced because they are broader than necessary to protect any legitimate interest that Heritage may have and that the provisions have an adverse impact on the public interest. *See* Def.'s Pre-Trial Br. at 32-39 (Docket No. 105). The Court must disagree with Phibro-Tech's arguments.

31. First, the Court finds that the non-compete provisions serve to protect legitimate interests. Among other rights, Heritage was purchasing the right to use Phibro-Tech's formulas and to sell to Phibro-Tech's customers in the eastern portion of the United States without fear of competition from Phibro-Tech. The term for the licenses was ten years.

32. The non-compete provisions are not broader than necessary to protect Heritage's rights under the agreements. The time period for the non-compete provisions, ten years, is the same as the time period governing the licenses. Further, the non-compete provisions are essentially limited to the to the eastern part of the United States. Thus, the non-compete provisions cover the same geographic area as that part of Phibro-Tech's business that Heritage had purchased. Finally, the activity prohibited by the provisions is reasonable. In essence, the non-compete provisions restricted Phibro-Tech from engaging in the business that it sold to Heritage but, because of several "provided that clauses," permitted Phibro-Tech to keep performing its other business activities. *See* Pl.'s Ex. 1B, § 8.1, p. 16. In other words, the non-compete provisions are limited to those customers and formulas purchased, and so they are reasonable because they are "limited to the area of business involved." *Dicen*, 839 N.E.2d at 688 (quoting *Donahue*, 234 Ind. at 405-06, 127 N.E.2d at 238).

33.   In addition, the Court concludes that the non-compete agreements do not have an unreasonable effect on Phibro-Tech.  At bottom, the non-compete provisions restricted Phibro-Tech from competing with the business that Heritage purchased.  As the Court has already found, the agreements were executed after arms-length negotiations between two sophisticated companies of equal bargaining power.  The non-compete provisions do no more than govern the rights for which the parties themselves bargained.

34.   Lastly, Phibro-Tech has presented no evidence that the non-compete provisions produce any deleterious effects on the public interest.  To the extent that there would be any ill effect on the public interest, the Court concludes that it is negligible.  The testimony at trial indicated that the etchant industry was declining because manufacturers in the printed circuit board industry, *i.e.*, the customer base, had begun outsourcing to Asia.  *See* Trial Tr. at 23-24, 224, 259.  Moreover, the elimination of Phibro-Tech as a competitor for some customers in the eastern United States is not a significant factor when the result is a mere drop from three suppliers to two suppliers, particularly when the inference is that Phibro-Tech was selling off part of its business anyway because of a declining customer base.  Finally, there is no evidence that customers suffered from higher prices because of the non-compete provisions.  The only evidence about prices related to the PCB incident, but that evidence does not reveal what PCB might have been paying before the agreements were signed and how it compared to the $0.95 per gallon that Heritage had been charging before Phibro-Tech gave  the email price quote.  Therefore, the Court concludes that Phibro-Tech has failed to demonstrate that the non-compete provisions harm the public interest.

35.   As this Court has noted, before a contract is voided based on policy arguments, Indiana courts generally "look for a clear manifestation of pubic policy, a tendency to injury the public, or

contracts 'against the public good' or 'inconsistent with sound policy and good morals.'" *Dearborn v Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802, 814 (S.D. Ind. 2007) (quoting *Straub v. B.M.T.*, 645 N.E.2d 597, 599 (Ind. 1994)).  In fact, the Indiana Supreme Court has recognized that the power of a court to declare a contract void under public policy is "a very delicate and undefined power." *Straub*, 645 N.E.2d at 599 n. 3.  The Court sees no reason to justify exercising such delicate and undefined power in this instance.

36.   Moreover, Indiana law recognizes and upholds the right of businesses to buy each other out of the market.  *See, e.g.*, *Dicen*, 839 N.E.2d at 688.  In fact, the Indiana Supreme Court has upheld covenants that restrict a covenantor from soliciting or contracting with entities listed in the parties' agreements, *see id.* at 688-89, which is similar to what the non-compete provisions do in the case at bar.

37.   In light of the foregoing, the Court finds that the non-compete provisions are reasonable and enforceable.  Therefore, Phibro-Tech's request for a declaration to the contrary is **DENIED**.

## 2.   Heritage's Claim For Breach Of The Non-Compete Provisions

38.   Because the Court has concluded that the non-compete provisions are not against public policy and are enforceable, the Court now addresses Heritage's claim for breach of the non-compete provisions.  In Indiana, the essential elements for a breach of contract claim are (1) the existence of a valid contract; (2) a breach of the contract's terms; and (3) damages resulting from the breach.  *See Collins v. McKinney*, 871 N.E.2d 363, 368 (Ind. Ct. App. 2007).

39.   The Court concludes that the first two elements of Heritage's breach of contract claim are easily met.  The existence of the contract is not in dispute and, as the Court has already

concluded, non-compete provisions at issue are enforceable.  Further, there is no dispute that Phibro-Tech violated the terms of the non-compete provisions by contacting PCB.  *See* Trial Tr. at 181-82; Pl.'s Ex. 1A, Schedule 1; Pl.'s Ex. 1B, Schedule 2.2; Pl.'s Ex. 29.  Indeed, Phibro-Tech has already admitted that this is the case.  *See* Pl.'s Ex. 38.

40.   The only remaining dispute is whether Heritage has demonstrated that it suffered damages as a result of Phibro-Tech's breach of the non-compete provisions.

41.   As an initial matter, the Court concludes that, at most, Heritage is only entitled to recover the difference in price for the length of Phibro-Tech's quote, which was six months.  *See* Pl.'s Ex. 29.  Phibro-Tech's email quote, when initially made, would only have been valid for six months, and after that period of time it would have been free to renegotiate a different rate with PCB.  Therefore, at most, Heritage would only be entitled to recover its loss during this period, which its own calculations reveal to be $22,084.78.  *See* Pl.'s Ex. 31.

42.  However, the Court concludes that Heritage is not entitled to recover any money for its breach of contract claim because it has failed to demonstrate that it suffered damages as a result of Phibro-Tech's breach of the non-compete provisions.

43.   As soon as the PCB incident was brought to his attention, Glover had the email quote withdrawn and apologized to Steward.  *See* Trial Tr. at 126-27, 237-38, 241.  The Court concludes that Phibro-Tech's violation was inadvertent and notes that it received no business from the email quote.  *See* Trial Tr. at 187-88, 237-38, 241.  Aside from this one incident, there is no evidence that Phibro-Tech has provided any other quotes to a customer listed on the Schedule of Customers. *See* Trial Tr. at 137, 188-89.

44. Heritage's stated reason for lowering its selling price was fear that it would lose PCB as a customer.  *See* Trial Tr. at 54.  However, Heritage made no effort to contact PCB or to continue charging its regular rate for the fresh etchant even after the email quote had been withdrawn.  *See* Trial Tr. at 127-28, 187-88.  In fact, it did not even attempt to raise the lowered price until ninety days before trial.  *See* Trial Tr. at 128, 189-90.

45. The Court is unconvinced that Heritage's fear was justified.  Even though Cohen testified that the etchant business is price-driven and that price is the dominant factor in making a sale of fresh etchant, *see* Trial Tr. at 190, that testimony does not square with the circumstances of the business at the time of the PCB incident.  Specifically, as can be inferred from Steward's testimony regarding the importance of the licenses for the use of Phibro-Tech's formula, etchant customers require a specific formula for their business in order to be assured of meeting quality control levels.  *See* Trial Tr. at 17, 51, 180.  Absent the same formula, those customers require testing of a new batch to be satisfied that the same quality will be achieved.  *See id.*  This was no doubt the reason that Phibro-Tech and Heritage undertook efforts to assure the customers that Heritage would be providing the same formula that they were used to getting from Phibro-Tech.  *See* Pl.'s Ex. 45.

46. Because Phibro-Tech was prohibited from selling to PCB, and in fact had withdrawn its email quote, the only other potential supplier in the market was Old Bridge.  *See* Trial Tr. at 54, 191.  However, Heritage presented no evidence regarding the price that Old Bridge would charge for etchant or that it could even produce the same formula for PCB.  In other words, Heritage presented no evidence that the etchant formula used by PCB was readily accessible from another supplier in the market.

23

47.   Further, because Heritage did not contact PCB and did not present testimony from any PCB representative, there is no evidence that PCB considered using a different formula that could have been supplied by Old Bridge.  In fact, there is no evidence that PCB would have refused to pay Heritage's original negotiated price.

48.   Absent evidence that PCB could have readily obtained the same etchant formula from another supplier, or that it was considering using a different formula, there is no reasonable basis to conclude that Heritage would have lost PCB's business if it did not lower its price.  In short, there is no evidence that Heritage was unable to continue charging its former price and needed to lower the price.

49.   Moreover, even though Heritage feared that a quote would have a "ripple effect" on other customers, *see* Trial Tr. at 183-84, Heritage presented no evidence that any such effect has actually occurred.  In other words, Heritage offered no evidence that it lost sales to other customers or had to lower its prices for other customers as a result of the PCB incident.

50.   Based on the foregoing, the Court is unconvinced that Heritage's alleged damages are the result of the email quote.  Instead, the Court concludes that Heritage's fear about losing PCB's business if it did not lower its price was not reasonable based on the reality of the marketplace. Therefore, the Court finds that Heritage has failed to prove the damages element and, accordingly, that the breach of contract claim must fail.  Thus, the Court finds in favor of Phibro-Tech on this claim.

### 3. <u>Heritage's Request For A Permanent Injunction</u>

51. Heritage also contends that it is entitled to a permanent injunction against Phibro-Tech. Heritage argues that an injunction is necessary to protect it from a "ripple effect" and the threat of continued violations. *See* Trial Tr. at 284; Pl.'s Trial Br. at 11 (Docket No. 103). The alleged "ripple effect" relates to Cohen's testimony that the etchant industry is a close-knit industry and, therefore, that concessions on price to one customer often result in other customers demanding similar consideration, although he was unable to provide any specific examples of that happening. *See* Trial Tr. at 183-85.

52. Heritage's request for injunctive relief is predicated in part on the agreements. Both the License Agreement and the Services Agreement contain provisions that permit a party aggrieved by a violation of the non-compete provisions to seek injunctive relief. *See* Pl.'s Ex. 1A, § 8.3, p. 10; Pl.'s Ex. 1B, § 8.5, p. 17.[3]

53. The Court must determine whether a permanent injunction is appropriate in this case. This Court generally considers four factors when deciding whether to grant permanent injunctive relief: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if an injunction is not issued; (3) whether the threatened injury to the plaintiff outweighs the threatened harm that an injunction might inflict on the defendant; and (4) whether the granting of an injunction will harm the public interests.

---

[3] The Court notes that the provision in the License Agreement does contain one major difference from its counterpart in the Services Agreement: the Licence Agreement explicitly provides that an aggrieved party is not required to demonstrate any actual injury or damage to obtain injunctive relief. *See* Pl.'s Ex. 1A, § 8.3, p. 10; *Cf.* Pl.'s Ex. 1B, § 8.5, p. 17.

54. The Court concludes that permanent injunctive relief is inappropriate in this case. There has been no evidence that Phibro-Tech's inadvertent violation of the non-compete violations had any "ripple effect" on other customers. Indeed, as the Court has already concluded, there is no evidence that Heritage was even required to lower its price to PCB. In other words, Heritage has not prevailed on the merits of its breach of contract claim.

55. Moreover, even though the terms of the License Agreement do not require Heritage to demonstrate actual injury or damages, the Court is not convinced that Heritage will be irreparably harmed if an injunction is not issued. In the event that a future violation occurs, Heritage has a remedy available to it that is adequate: a breach of contract claim. There is no reason to suspect that, if there any damages from a future breach, such damages would not be measurable. Further, there is no evidence that Heritage has lost any sales as a result of the email quotation to PCB. Finally, Heritage still has a license to use the Phibro-Tech's formula and to sell to the customers on the Schedule of Customers. The ability to use Phibro-Tech's formula gives Heritage an advantage over Old Bridge, the only other competitor in the eastern United States who could sell to those customers, because customers can be assured that the product they receive from Heritage meets their required quality specifications. *See* Trial Tr. at 51, 180, 191.

56. In addition, the Court is unpersuaded that any threatened injury to Heritage outweighs the harm to Phibro-Tech. In fact, the Court is not convinced that there is a true threat of an injury to Heritage. Aside from the single email quote to PCB, Phibro-Tech has not provided a quote to any customer who is listed on the Schedule of Customers. Thus, there is no basis for Heritage's assertion that Phibro-Tech has engaged in "continuous" violations of the non-compete provisions. Further, with respect to the February 2006 exchange of letters between Steward and Glover wherein Glover

asserts Phibro-Tech's position that the non-compete provisions are unenforceable, the Court does not consider those letters to be sufficient to constitute a real threat of injury. *See* Def.'s Exs. 13-15. Instead, those letters strike the Court as little more than litigation posturing designed to make the other side "blink" first. The Court, having found and declared the provisions to be enforceable, has not been presented with any reason to suspect that Phibro-Tech will not abide by the provisions or honor them in the future.

57. For the foregoing reasons, the Court **DENIES** Heritage's request for a permanent injunction.

## C. ATTORNEYS' FEES AND COSTS

58. Based on the foregoing, Heritage has prevailed on its request for a declaration that the term "$0.1" should be read as "$0.10" (*i.e.*, a dime); therefore, pursuant to the terms of the contract between the parties, it is entitled to recover its reasonable attorneys' fees and costs from Phibro-Tech for litigating this issue. *See* Pl.'s Ex. 1B, § 10.14, p. 22.

59. Heritage has submitted invoices through September 2007 for its claimed fees and costs for litigating all of the issues in this case. *See* Pl.'s Ex. 42. The total of those invoices is $262,000.84. *See id.*

60. Because the invoices do not take into account any additional attorneys' fees and costs that Heritage might have incurred since September 2007, particularly those related to the bench trial in this matter, and because it highly probable that not all of those fees and costs are related to the issue about the term "$0.1," Heritage shall have **seven (7) days from the date of this Order** to file appropriate documentation supplementing the amount of its total claimed attorneys' fees and costs

27

related to that one issue.  Phibro-Tech shall then have **fourteen (14) days after Heritage files any**

**supplementary materials** to file an objection to the amount of claimed attorneys' fees and costs,

including those fees and costs that it believes are not related to litigating the meaning of the contract

term "$0.1."  Finally, Heritage shall have **seven (7) days after Phibro-Tech files its objection** to

file any reply in support of the claimed attorneys' fees and costs.


### III.  CONCLUSION

Based on the foregoing, the Court finds in favor of the Plaintiff, Heritage Technologies,

L.L.C., and against the Defendant, Phibro-Tech, Inc., with respect to the dispute over the term

"$0.1."  The Court declares that the term means a dime, or $0.10.

In addition, with respect to the non-compete provisions, the Court finds that the provisions

are not against public policy and are enforceable, and Phibro-Tech is expected to honor and respect

those provisions.  However, the Court also finds that Heritage has failed to prove its claim for a

breach of those provisions and has failed to demonstrate that a permanent injunction against Phibro-

Tech is warranted.  Therefore, the Court **DENIES** the request for a permanent injunction and

**DISMISSES with prejudice** Heritage's breach of contract claim.

Finally, because Heritage was the prevailing party on the issue regarding the term "$0.1," the

Court finds that Heritage is entitled to its reasonable attorneys' fees and costs related to that issue.

Heritage shall submit have **seven (7) days from the date of this Order** to file its request for those

fees and costs with appropriate documentation detailing the total amount.  Phibro-Tech shall then

have **fourteen (14) days after Heritage files its request** to file an objection to the amount of

claimed attorneys' fees and costs, including those fees and costs that it believes are not related to

litigating the meaning of the contract term "$0.1." Finally, Heritage shall have **seven (7) days after**

**Phibro-Tech files its objection** to file any reply in support of the claimed attorneys' fees and costs.

IT IS SO ORDERED this 2ⁿᵈ  day of January, 2008.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


**Electronically distributed to:**

Thomas A. Cunningham
CUNNINGHAM WELSH DARLOW ZOOK & CHAPOTON, LLP
tcunningham@cdzc.com

Andrew W. Gefell
PROSKAUER ROSE LLP
agefell@proskauer.com

Erik Christopher Johnson
ICE MILLER LLP
erik.johnson@icemiller.com

G. Daniel Kelley Jr.
ICE MILLER LLP
daniel.kelley@icemiller.com

Michael T. Mervis
PROSKAUER ROSE LLP
mmervis@proskauer.com

Michael  Rabinowitch
WOODEN & McLAUGHLIN LLP
mrabinowitch@woodmaclaw.com

Matthew R. St. Louis
ICE MILLER LLP
matthew.st.louis@icemiller.com